IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10-CR-71 |
| | ) | |
| JEFFERY SILER, | ) | (VARLAN/SHIRLEY) |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pre-trial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. Defendant Jeffery Siler ("Defendant") is charged in a one count Indictment for the alleged offense of a felon in possession of a firearm. [Doc. 1]. This matter is before the Court on the Defendant's Motion to Suppress Statements [Doc. 13]. On September 9, 2010, the parties appeared before the Court for an evidentiary hearing on the instant motion. At the September hearing, Assistant United States Attorney Kelly A. Norris appeared on behalf of the government, and Assistant Federal Defender Jonathan A. Moffatt appeared on behalf of the Defendant, who was also present.

At the conclusion of the hearing, the parties requested the opportunity to file post-hearing briefs, which were filed on October 4, 2010. [Docs. 24, 25]. The parties filed replies to the post-hearing briefs on October 15, 2010. [Docs. 26, 27]. The Court took the motions, evidence, briefs, and arguments under advisement on the following business day.

# I.   FACTS

At the evidentiary hearing, the Court heard testimony from one witness: Investigator David Ogle.   Seven video discs were introduced into evidence as exhibits to the testimony. Investigator Ogle's  testimony is as follows:

## A.  Investigator David Ogle

### (i) Direct Examination

Investigator David Ogle ("Investigator Ogle") testified that he has been employed by the Knoxville Police Department ("KPD") for ten years.   Investigator Ogle stated that for the last four years he has worked as a criminal investigator for the property crimes unit of KPD and that his duties are to investigate home burglary cases.   Investigator Ogle testified that he received training at the FBI Interrogation School and the Interview and Interrogation School in Knox County.   In addition, Investigator Ogle stated that he attended a Kensisic Interview and Interrogation school, which involved the study of non-verbal cues.   Investigator Ogle explained that his role to find the facts when interrogating suspects.   Investigator Ogle testified that he was assigned several burglary cases by KPD.

Investigator Ogle testified that he was assigned to burglary cases in the Fountain City area, and his investigation of a burglary on Hillcrest Drive ("Hillcrest"), led to his involvement with the Defendant.   Investigator Ogle stated that he interviewed the Defendant on two separate occasions. Investigator Ogle testified that the first meeting with the Defendant occurred on February 22, 2010, after the Defendant's arrest on a probation violation.   Investigator Ogle testified that there was a bulletin out that he wanted to speak with the Defendant regarding various home burglaries in the Fountain City area, and that once the Defendant was arrested, Investigator Ogle was notified that

he was in custody. Investigator Ogle testified that he interviewed the Defendant again on March 2, 2010. Investigator Ogle stated that the second interview took place as a result of several phone calls from both the Defendant and the Defendant's wife expressing the Defendant's desire to speak with Investigator Ogle again.

The Government presented three video recordings of the February 22, 2010 interview ("first interview") and four video recordings of the March 2, 2010 interview ("second interview"), which were admitted into evidence at 1A, 1B, 1C and 2A, 2B, 2C, 2D, respectively.

Investigator Ogle testified that during the first interview, the Defendant was agitated and confrontational. Specifically, Investigator Ogle recalled at one point, the Defendant walked around the interview room, shoved papers off a desk, and told Investigator Ogle that he was tired of his "jibber-jabber." [Tr. 15]. Investigator Ogle testified that this type of behavior was not common during an interview. During the second interview, Investigator Ogle testified that the Defendant's demeanor was different in that he was "very apologetic" and "cooperative." [Tr. 15]. During both interviews, Investigator Ogle testified that he read aloud the Defendant's Miranda rights. Investigator Ogle stated that in both instances the Defendant acknowledged that he understood his rights and signed a waiver form.

Investigator Ogle was then shown what was introduced into evidence as Exhibits 1A, 1B, 1C. Investigator Ogle identified Exhibits 1A, 1B, and 1C as videos of the first interview conducted with the Defendant, and testified that the videos were an accurate representation of the interview. Investigator Ogle was next shown what was introduced into evidence as Exhibits 2A, 2B, 2C, and 2D. Investigator Ogle identified Exhibits 2A, 2B, 2C, and 2D as videos of his second interview conducted with the Defendant on March 2, 2010, and testified that the videos were an

accurate representation of the interview.

## First Interview - February 22, 2010

During the first interview, as seen on the video, the Defendant was allowed to use the restroom and provided water before the first interview commenced. [Ex. 1A at 12:44:46]. After the Defendant returned from the restroom, Investigator Ogle entered the room to begin the interview. Investigator Ogle confirmed his identity on the video during the hearing.

Investigator Ogle told the Defendant, as seen on the video, that Gary Johnson identified the Defendant as the man from whom he purchased two stolen rings. [Ex. 1B at 13:15:49]. Investigator Ogle indicated to the Defendant that this piece of information tied him to a home burglary on Hillcrest. Further, Investigator Ogle conveyed to the Defendant that if "you will work with me" regarding the location of the stolen property, that Investigator Ogle "would go to the district attorney" on the Defendant's behalf. [Ex. 1B at 13:32:28]. Investigator Ogle testified that at this point in the first interview, he was "letting [the Defendant] know, if he would be cooperative" about the location of the property, then he "would talk to the district attorney and let them know that [the Defendant] was cooperative." [Tr. 20].

As the first interview continued, Investigator Ogle told the Defendant that there was a "pretty good case" against him for committing the Hillcrest burglary, where the stolen property included: two rings, a gun, and a watch. The video shows that Investigator Ogle then presented the Defendant with the evidence against him: (1) a "lady comes home and sees you in the house" and subsequently picked the Defendant out of a line up; (2) Gary Johnson bought the stolen rings from the Defendant and identified the Defendant as selling the rings to him; and (3) the KPD was in

possession of the stolen rings which contained the Defendant's DNA. [Ex. 1B at 13:32:37].

Investigator Ogle pushed further, as seen on the video, stating "[h]elp me and I'll help you." [Ex. 1B at 13:39:12]. Investigator Ogle stated that he would go to the district attorney if the Defendant would cooperate, because he was either "messed up on pills . . . or messed up on crack." [Ex. 1B at 13:39:40]. The Defendant told Investigator Ogle that he was forty-five years old. [Ex. 1B at 13:40:45]. The Defendant then asked, "[w]hat did I burglarize?" At that point, Investigator Ogle reiterated that the victim saw the Defendant flee the house on Hillcrest and the police obtained DNA evidence from the stolen rings. [Ex. 1B at 13:41:03]. The Defendant asked to see the DNA evidence, because "[he] doesn't even know what [Gary Johnson] is talking about." [Ex. 1B at 13:41:35]. Investigator Ogle stated that there was a "positive hit," but if the Defendant would help locate the stolen Kimber gun, Investigator Ogle would talk to the district attorney about the Defendant's drug problem. [Ex. 1B at 13:42:04]. The Defendant stated, "[h]ow in the world do you think I can help you get the gun back when I don't have the gun." [Ex. 1B at 13:42:38]. Investigator Ogle then stated he does not know where the Defendant sold the gun, but "[i]f you'll help me bust up some of these gold exchanges ... I will scream wonders to the district attorney." [Ex. 1B at 13:43:38].

As seen on the video, Investigator Ogle and the Defendant discussed the Defendant's "lengthy" criminal history and the potential impact of an aggravated burglary charge and felony theft charges, indicating that something more than "nothing" would happen to the Defendant if convicted of these offenses. [1B at 13:46:16]. The Defendant responded that he did not understand "why [Gary Johnson] pegging [him]" and he wanted to see the DNA evidence and the proof that the victim identified him. [Ex. 1B at 13:46:37]. The Defendant reiterated that he would like to see the letter

from the state that proved his DNA was on the stolen rings.  [Ex. 1B at 13:46:55].  The Defendant stated, "[w]hy you think its me," and Investigator Ogle again reiterated the evidence against the Defendant.  [Ex. 1B at 13:46:10].  Once again, the Defendant asserted he would like to see the evidence against him.  [Ex. 1B at 13:48:15].

Investigator Ogle testified at the hearing that there was no DNA evidence against the Defendant.  Investigator Ogle also testified that the victim did not identify the Defendant in this case.  Further, Investigator Ogle testified that it was accurate that Gary Johnson made a statement to Investigator Ogle identifying the Defendant as the person from whom he bought the stolen rings. Investigator Ogle testified that rings came from the home on Hillcrest.  Investigator Ogle testified that a Kimber handgun and a Luminox dive watch were also stolen from the home on Hillcrest.

As the first interview progressed, the video shows Investigator Ogle stating that, "I'm going to put charges on you . . . we're going to go to court and see what happens," indicating that he was going to charge the Defendant with burglary.  [Ex. 1B at 13:59:13].  Investigator Ogle then told the Defendant that he would go to the district attorney to help get him into a drug rehabilitation program, if the Defendant would cooperate in locating the stolen property.  [Ex. 1B at 14:01:00]. Investigator Ogle then offered to let the Defendant speak with his attorney about the possibility of drug rehabilitation.  [Ex. 1B at 14:01:07].  The Defendant did not indicate that he wished to speak with an attorney.  A few moments later, Investigator Ogle stated that if the Defendant was selling the stolen property on the street, then he would "put [the Defendant] back on the street and let [him] go get it . . .but you have to be willing to work with me."  [Ex. 1B at 14:01:41].  Investigator Ogle reiterates that "all I'm asking is for you to work with me and get some people's property back" and then the Defendant could "get some court-ordered help."  [Ex. 1B at 14:03:17].

Investigator Ogle told the Defendant that another eight to ten year sentence would be "detrimental," because the Defendant was "getting to old for this shit." [Ex. 1B at 14:02:40]. Investigator Ogle then asked how many times had the Defendant's probation been reinstated in the past. [Ex. 1B at 14:03:26]. Investigator Ogle then told the Defendant, "you know as well as I do that prisons are crowed and they are more than willing to work with you" to get back on probation. [Ex. 1B at 14:03:35].

Investigator Ogle testified that the district attorney could place the Defendant in drug rehabilitation. Investigator Ogle testified that a defendant would first be charged and placed in jail before entering in drug rehabilitation. Investigator Ogle testified that placing a defendant in drug rehabilitation does not mean they are released from jail.

As further seen on the video, after reiterating promises to inform the district attorney of the Defendant's cooperation, the Defendant s told Investigator Ogle that he was "jibber-jabbering" and he "ain't offered [him] shit." [Ex. 1B, 14:11:17-22]. Investigator Ogle responded that he was not "jibber-jabbering" and "what we say to the district attorney goes a long, long way," but that he "can't promise [the Defendant] a thing." [Ex. 1B at 14:11:54]. Further, Investigator Ogle stated, "If you'll get that gun back for me . . . I can't promise you nothing but . . . I'm going to be the one typing up the warrants and going to the district attorney." [Ex. 1B at 14:12:02].

Investigator Ogle, as seen on the video, reiterated that he was "willing to work with [the Defendant]." [Ex. 1C at 14:12:37]. The Defendant asked Investigator Ogle how he could help. [Ex. 1C at 14:12:39]. Investigator Ogle replied that, "it all has to do with whether you get charged or whether you get sent to rehab, whether you get sent to prison or whether you go to rehab." [Ex. 1C at 14:12:43]. The Defendant then told Investigator Olge to stop "jibber-jabbering," and if he was

unable to make any decisions, then "we need to get a DA here." [Ex. 1C at 14:12:48]. Investigator

Ogle responded, "then we would have to charge you," and the Defendant stated "well go ahead and

charge me." [Ex. 1C at 14:12:54]. Investigator Ogle, as seen on the video, reiterated that if the

Defendant will work with him to get the stolen property back, then the Defendant would not be

"facing a bunch of charges." [Ex. 1C at 14:13:22].

       Investigator Ogle testified that when stated "a bunch of charges" during the interview,

he was referencing the fact that the Defendant was a suspect in up to "twenty or thirty" burglaries

in Fountain City and Colonial Village. [Tr. 22]. Investigator Ogle testified that these burglaries

were discussed with the Defendant throughout the first interview. Investigator Ogle testified that

suspects "[h]ardly ever" tell him to stop "jibber-jabbering." [Tr. 22-23].

       After Investigator Ogle discussed that he was "going to start typing up the warrants

today," the video indicates that Investigator Ogle left the interview room. [Ex. 1C at 14:20:08].

Investigator Ogle testified that after leaving the room, he "didn't have anything, [the Defendant]

hadn't confessed to anything" and he believed the interview was over. [Tr. 23]. As shown on the

video, approximately one minute passed before the Defendant knocked on the interview door,

signaling his desire to speak with Investigator Ogle again. [Ex. 1C at 14:23:52]. Investigator Ogle

testified that before the Defendant knocked on the door, he had no intention of going back into the

interview room.

       When Investigator Ogle re-entered the interview room, the Defendant said he "still

wanted to see the DNA," but asked what could be done for him today, if he were to help "put [the

police] up on the gun," immediately changing his phrasing to "a gun." [Ex. 1C at 14:24:40]. First,

Investigator Ogle said he would "go to the district attorney," to which the Defendant replied "fuck

that . . . today what [are] you talking about." [Ex. 1C at 14:25:06]. Investigator Ogle told the Defendant, as seen on the video, that if he got the gun back, he would convey to the Defendant's probation officer that the Defendant was a good candidate for probation and he would "appreciate [the probation officer's] help putting him back out." [Ex. 1C at 14:25:16]. Then Investigator Ogle stated that he would "appreciate the [probation officer's] help" in speaking with the district attorney. [Ex. 1C at 14:25:20]. Investigator Ogle testified that he was communicating that if the Defendant worked with him, he would go to the Defendant's probation officer and recommend re-establishing his probation.

At this point in the interview, the Defendant stated that he was listening to what Investigator Ogle was saying and "it [was] sounding pretty good," but indicated that he wanted to know what Investigator Ogle could do "right now." [Ex. 1C at 14:25:55]. After this statement, the Defendant stood and moved toward a stack of papers sitting on a table beside Investigator Ogle. [Ex. 1C at 14:26:05]. The Defendant pushed the stack of papers to the opposite side of the table. [Ex. 1C at 14:26:10]. Investigator Ogle testified that the stack of papers contained "about thirty" different investigations involving the Defendant, which they had been discussing throughout the course of the interview. [Tr. 24]. The Defendant inquired if the stack of papers would go "in the trash can" if he aided Investigator Ogle in locating the stolen gun. [Ex. 1C at 14:26:18]. Investigator Ogle responded to this action by stating, "[t]here you go."[Ex. 1C at 14:26:19]. Investigator Ogle stated that he would do his best to get the Defendant drug help, "if [the Defendant] want[ed] it." [Ex. 1C at 14:26:37].

The Defendant told Investigator Ogle that while he was talking about drug help, all the Defendant wanted to know was what would happen to him "today." [Ex. 1C at 14:26:54].

Investigator Ogle responded, "we arrest you." [Ex. 1C at 14:26:58]. The Defendant asked Investigator Ogle what would happen if he cooperated about the location of the gun. Investigator Ogle stated that he would contact the Defendant's probation officer and help get him reinstated on "drug help." [Ex. 1C at 14:27:54]. Investigator Ogle further indicated that if the Defendant cooperated, he might have him "fence some stuff." [Ex. 1C at 14:28:01]. The Defendant indicated he was not concerned with the further discussion of drug rehabilitation, but was interested in what Investigator Ogle could do about the stack of papers on the table. [Ex. 1C at 14:28:18]. Investigator Ogle stood, pulled together the same stack of papers, and told the Defendant that "you don't have to worry about [it]." [Ex. 1C at 14:28:24].

As seen on the video, the Defendant then asked Investigator Ogle to "put that in writing." [Ex. 1C at 14:28:28]. Investigator Ogle replied that without the district attorney's involvement, a writing would not mean anything. Investigator Ogle then stated that he was the one who typed the warrants and if a warrant is not typed, the Defendant would not get charged with a crime. Investigator Ogle testified that at this point in the interview, he was conveying to the Defendant that if there was not sufficient evidence to establish probable cause to arrest, the Defendant would not be charged.

The Defendant then asked, as seen on the video, who would get charged with the stolen gun. Investigator Ogle responded that "nobody" will get charged with the gun. [Ex. 1C at 14:29:11]. The Defendant reiterated his question and Investigator Ogle stated "nobody's going to get charged with the gun." [Ex. 1C at 14:29:19]. The Defendant said he did not understand how no one would get charged with the gun and, for a third time, Investigator Ogle responded that "nobody's going to get charged with the gun." [Ex. 1C at 14:29:41]. The Defendant then asked if

the gun was found in someone's home, would that person be charged with possessing the stolen gun. Investigator Ogle responded "thank you . . . I will not charge them." [Ex. 1C at 14:29:44]. Investigator Ogle further stated, "I don't give a shit about putting you in jail." [Ex. 1C at 14:30:06]. Investigator Ogle testified that during the gun discussion, he believed the Defendant's wife or another family member was in possession of the gun and felt the Defendant feared that person would be charged. Investigator Ogle testified that at no point in the interview did the Defendant specifically ask about being charged with the gun. Investigator Ogle testified that he explained to the Defendant if the gun were found in someone else's home, they would not be charged with possession of the gun.

Investigator Ogle then told the Defendant, as seen on the video, that if he could produce the gun, then Investigator Ogle would speak to his probation officer. [Ex. 1C at 14:37:17]. Investigator Ogle testified at the hearing that he was telling the Defendant that his probation officer would have to make the decision to re-establish his probation. The first interview concluded with Investigator Ogle leaving the interview room, indicating to the Defendant that he was contacting his probation officer. [Ex. 1C at 14:41:06]. As seen on the video, the Defendant pointed the stack of papers, and stated "[w]hat about this shit right here." [Ex. 1C at 14:41:06]. Investigator Ogle responded "[y]ou don't have to worry about it. I just want the gun." [Ex. 1C at 14:41:20].

### Second Interview - March 2, 2010

The second interview occurred eight days later on March 2, 2010. Investigator Ogle testified that he was contacted several times by the Defendant and the Defendant's wife requesting a second interview. The Defendant apologized to Investigator Ogle about his behavior during the first interview, explaining that he was using drugs and alcohol. [Ex. 2A at 12:54:39]. The

Defendant stated that he had "done wrong" and that he had "failed . . . [by starting] to use drugs and alcohol," after being released from prison the last time.  [Ex. 2A at 12:55:10].  Investigator Ogle explained that if he could not get the Defendant off of drugs, then the Defendant was "going to keep doing this."  [Ex. 2A at 12:55:41].  Investigator Ogle indicated to the Defendant that he would like to speak about the Kimber handgun again.  [Ex. 2A at 12:58:19].

As seen on the video, the Defendant was then read aloud his <u>Miranda</u> rights by Investigator Ogle.  [Ex. 2A at 12:56:37].  The Defendant asked Investigator Ogle if the statements he made during the interview would "incriminate" himself.  [Ex. 2A at 12:57:10].  Investigator Ogle responded that he did not know, but that he "could not get [the Defendant] help unless it is court-ordered."  [Ex. 2A at 12:57:16].  Further, Investigator Ogle stated that he could not get the Defendant court-ordered help unless is through the district attorney.  [Ex. 2A at 12:57:19].  Investigator Ogle told the Defendant, as indicated on the video, that "I believe we can get that done . . . I can't make you any promises."  [Ex. 2A at 12:57:27].  In addition, Investigator Ogle stated that he would speak with the district attorney about the Defendant's help in retrieving the property, and convey that the Defendant was "ready to get some help."  [Ex. 2A at 12:57:41].  Investigator Ogle said, as seen on the video, that "without you getting help, I can't do nothing."  [Ex. 2A at 12:57:46].  The Defendant subsequently signed a waiver of his <u>Miranda</u> rights.  [Ex. 2A at 12:57:58].

After the Defendant waived his <u>Miranda</u> rights, Investigator Ogle discussed Gary Johnson's statement with the Defendant.  The Defendant stated that Gary Johnson was "not telling the whole truth."  [Ex. 2A at 12:39:40].  The Defendant said, "I don't understand . . . [Gary Johnson] knowed [the rings] hot and . . . then he try to put it all on me."  [Ex. 2A at 13:00:40].  The Defendant then indicated that he spoke with his wife, and that he "[did not] want people to talk about [him] .

. . like all he does is burglary." [Ex. 2A at 13:01:27]. The Defendant indicated he was agitated by Gary Johnson's statement, and told Investigator Ogle that, "I'm going to put y'all in the direction of where that gun is at." [Ex. 2A at 13:02:02].

After stating he was going to point Investigator Ogle in the direction of the stolen gun, the Defendant then said he did not want to say anything that would "incriminate" himself. [Ex. 2A at 13:02:20]. Investigator Ogle responded that he understood, and that he "promise[d] [the Defendant] that he would go to the district attorney" and convey the Defendant's help with Gary Johnson, the stolen handgun, and the places where the stolen property was taken. [Ex. 2A at 13:02:25]. Investigator Ogle stated that the district attorney "always works with us" and that he "believe[d] . . . I know they will work with us this time." [Ex. 2A at 13:02:30].

At this point in the second interview, as indicated on the video, the Defendant stated that Gary Johnson was with him on the day the gun was stolen. [Ex. 2A at 13:03:00]. The Defendant first stated that Gary Johnson was "in there with [him]." [Ex. 2A at 13:03:03]. The Defendant then stated that Gary Johnson was driving the vehicle. [Ex. 2A at 13:03:16]. Further, the Defendant said that he entered the home through the front door. [Ex. 2A at 13:04:02]. The Defendant stated that Gary Johnson saw a woman drive back up to the home and, at that point, he "took off running." [Ex. 2A at 13:04:16]. Investigator Ogle, as seen on the video, advised the Defendant to "stop being scared" and that he wanted to "get [the Defendant] some help." [Ex. 2A at 13:04:47]. The Defendant indicated that he wanted assurances that no one knew that he was speaking with Investigator Ogle. [Ex. 2A at 13:05:07]. After the Defendant received such assurances from Investigator Ogle, as seen on the video, the Defendant then said he sold the gun to his nephew, Jeremy Siler. [Ex. 2A at 13:05:25].

After Defendant confessed the location of the gun and his involvement in the burglary, the Defendant then expressed his desire to "repent for his sins," and let people know he "was sorry." The Defendant said that he "lost [his] way" after leaving prison. [Ex. 2A at 13:07:15]. As seen on the video, Investigator Ogle responded that "you don't need me to repent for your sins. . . you know that right" and that "you have to make peace with God." [Ex. 2A at 13:08:09]. The Defendant responded that he "[knew] that . . . I need to repent for my own sins." [Ex. 2A at 13:08:09]. Investigator Ogle then told the Defendant that "you are doing the right thing . . . you are doing what God would want you to do." [Ex. 2A at 13:08:35]. The Defendant responded that he understood and that he had "come to [his] senses . . . that's why I had my wife to call you." [Ex. 2A at 13:08:25]. The Defendant then told Investigator Ogle that he was paid three hundred dollars for the gun. [Ex. 2A at 13:08:41]. Investigator Ogle then responded that the Defendant's nephew was not in any trouble with him. [Ex. 2A at13:08:58]. Investigator Ogle testified that, at this point in the interview, he was conveying to Defendant that "he didn't need me to repent for his sins, he needed to talk to God about that."

After the Defendant confessed the whereabouts of the stolen gun, he stated that Investigator Ogle had "made some sense" during the last interview. [Ex. 2B at 13:36:30]. As indicated on the video, the Defendant told Investigator Ogle that he was using drugs and alcohol. [Ex. 2B at 13:36:36]. Investigator Ogle told the Defendant he was going to charge him with burglary, because "that's how [he could] get [the Defendant] into rehab." [Ex. 2C at 14:08:34]. Investigator Ogle, once again, told the Defendant that he would speak to the district attorney about getting the Defendant "help," and the Defendant stated, "I understand that ... talk to me." [Ex. 2C at 14:08:48].

At a later point in the second interview, the Defendant stated he remembered what Investigator Ogle told him about drug rehabilitation, that he prayed about it, and realized that he needed "help." [Ex. 2C at 14:12:42]. Investigator Ogle told the Defendant he was going to go to the district attorney and do "everything [he] could" to get the Defendant into drug rehabilitation. [Ex. 2C at 14:13:30].

As the interview progressed, the Defendant was interested in the charges against him. Investigator Ogle said he was only charging the Defendant with burglary. [Ex. 2C at 14:16:41]. Investigator Ogle further stated that he was "not going to go across the street" on the Defendant, conveying that he was not going to go to the government with the gun charge. [Ex. 2C at 14:16:48]. Investigator Ogle told the Defendant that he would not be "charged federally or anything like that." [Ex. 2C at 14:16:51]. Investigator Ogle testified that, at that point in the interview, he did not plan to go to the federal government with charges.

Investigator Ogle testified that at the end of the interview, the Defendant was allowed to call his wife. [Ex. 2D at 14:49:20]. Investigator Ogle testified that the Defendant was alone in the interview room during the phone conversation.

Investigator Ogle testified that the Defendant was charged with two cases of aggravated burglary and two cases of felony theft in state court. Investigator Ogle testified that he spoke with the district attorney about the Defendant's case. Investigator Ogle testified that he attempted to contact the Defendant's probation officer. Investigator Ogle testified that the current state charges against the Defendant had been bound over to the grand jury.

### (ii)    Cross Examination

Attorney Moffatt questioned Investigator Ogle, at which time the following additional testimony was elicited.   Investigator Ogle recalled that the burglary on Hillcrest occurred on January 13, 2010, approximately a month prior to Investigator Ogle's first interview with the Defendant.  Investigator Ogle testified that when he was assigned to the case, the Defendant was a suspect. Investigator Ogle testified that Gary Johnson was not a factor in the case at the time he was assigned the case.  Investigator Ogle said he spoke with the victim, Ms. Pendley.  Investigator Ogle stated that he attempted to locate the Defendant, and discovered he was in the community. Investigator Ogle testified that he did not determine whether the Defendant was on probation or parole at the time the case was assigned.

Investigator Ogle testified that the Defendant had a prior misdemeanor theft conviction, but was unsure if he knew about the theft or contacted his probation officer regarding the prior theft.  Investigator Ogle testified that he was aware prior to entering the police station that he would have an opportunity to speak with the Defendant that day.  Investigator Ogle testified that the Defendant was brought to the interview relatively quickly after his arrest.

Investigator Ogle was shown a video clip and identified that the clip was near the beginning of the interview.  Further, Investigator Ogle testified that he was on the video stating that he was not going to lie to the Defendant.  Investigator Ogle testified that he stated on the video he had no reason to lie to the Defendant.  The video indicates Investigator Ogle stating, "I'm not a man of lies."  [Ex. 1B at 13:13:21].  Investigator Ogle testified that he conveyed to the Defendant that the purpose behind the interview was to present his case against the Defendant.  Investigator Ogle testified that he wanted the Defendant to believe police officers had a strong case against him.

Further, Investigator Ogle testified that he wanted to convey to the Defendant that he was telling the truth, and that Investigator Ogle possessed the evidence presented to Defendant.

Investigator Ogle stated he believed that Defendant was using drugs because he was breaking into numerous homes in the Fountain City area. Investigator Ogle stated, however, that the Defendant was only charged with two burglaries.

The Defendant identified a later point in the video, and Investigator Ogle testified that during the first interview, he said to the Defendant "[t]here's no doubt you did this, Jeffrey." [Tr. 52]. In addition, Investigator Ogle said that during the first interview, he asked the Defendant about gold exchanges and pawn shops, stating that he wanted the Defendant's help to "bust up" those establishments. [Tr. 52]. Investigator Ogle testified that he was indicating there was illegality occurring in those establishments and the possibility of the Defendant assisting with those investigations. Further, Investigator Ogle testified that the Defendant could not be in jail and assist with such an undertaking. At points in the interview, Investigator Ogle testified that he explained to the Defendant that he could actually make purchases, if his probation was reinstated. Investigator Ogle further testified that there was a possibility that the Defendant would be reinstated, but the decision was up to his probation officer. Investigator Ogle, in addition, testified that during the course of the first interview, he told the Defendant that "we'll see what it takes to get you re-established." [Tr. 53]. Investigator Ogle stated that there was a chance of re-establishing that the Defendant's probation because what he "asks from the probation officer does weigh." [Tr. 53].

Investigator Ogle testified that no warrants were typed charging that the Defendant with burglary. Investigator Ogle testified that he wanted the Defendant to know that he had the power to determine if someone was ultimately charged.

Investigator Ogle testified that the next video clip occurred after he left the interview room. The video indicated that the Defendant said, "I got to go over there and get that gun." [Ex. 1C at 14:31:47]. Further, Investigator Ogle testified that the Defendant stated that he can have the gun in about "three hours." [Ex. 1C at 14:33:23]. At this point, Investigator Ogle testified that the Defendant was telling him there was a connection between himself and the Kimber handgun. Investigator Ogle stated he believed that in the video clip, the Defendant was referring to "a gun." As seen on the video, the Defendant refers to "that gun." Investigator Ogle testified that at this point, the interview was focused on the Pendley burglary. Investigator Ogle stated that based on this information there was "[n]othing that's probable to get a warrant." [Tr. 57].

Investigator Ogle testified that he repeatedly told the Defendant that he could get court-ordered drug treatment. Investigator Ogle testified that he was aware that people could receive drug rehabilitation without a court-order. Investigator Ogle testified that the Defendant was on the video telling his wife that "they're going to help me get into drug rehab." [Ex. 2D at 14:50:08].

### (iii)    Redirect

Investigator Ogle testified that there was photographic evidence of Gary Johnson selling the rings at Brimily's Gold Exchange. In addition, Investigator Ogle stated that he could not reinstate the Defendant's probation, even if that was his ultimate goal, because it was up to the Defendant's probation officer and a judge. Investigator Ogle testified that he explained this process to the Defendant during the course of the interview. With regard to writing up the warrants, Investigator Ogle testified that he must only decide whether there is sufficient evidence to charge a suspect. If there is sufficient evidence, Investigator Ogle stated that he always charges a

defendant. Investigator Ogle testified that the Defendant was not charged with the other burglaries because there was not sufficient evidence to write a warrant.

### (iv) Re-Cross Examination

Investigator Ogle testified that he did not tell the Defendant that he always brings a charge if there is sufficient evidence against a suspect.

## II. ANALYSIS

### A. The Defendant's Statements

In his Motion to Suppress Statements [Doc. 13], the Defendant moves to suppress all statements made to Investigator Ogle or any other officer during the February 22, 2010 and March 2, 2010 interviews. The Defendant argues that all of his statements during the February 22, 2010 and March 2, 2010 interviews regarding the the Kimber handgun were not made "voluntarily, knowingly, and intelligently" as required by the Fifth Amendment. [Doc. 13 at 5]. The Government responds that Investigator Ogle's behavior during both interviews did not rise to a level sufficient to render the Defendant's confession involuntary. [Doc. 19 at 17].

When determining the voluntariness of a confession, a court must find under the "totality of the circumstances" that the statement was the "product of an essentially free and unconstrained choice by its maker[.]" Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). The "key issue is whether a confession arises from the defendant's will being overborne." Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994) (finding that defendant's will not overborne only because the government leads him to believe that it has a greater knowledge of guilt than it really

-19-

does).  In assessing the totality of the circumstances, a court must consider the "age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep."  United States v. Haynes, 301 F.3d 669, 684 (6th Cir. 2002) (quoting Schneckloth, 412 U.S. at 226)).  The defendant's prior criminal record is relevant because it evidences an experience with law enforcement officers and makes it more likely that a suspect will not give involuntary confessions.  Ledbetter, 35 F.3d at 1070.

The Court of Appeals for the Sixth Circuit has established three requirements to support a determination that a confession is involuntary due to police coercion: "(1) police action was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement."  United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999) (citing McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988)).  The government bears the burden of proving the confession was voluntary by a preponderance of the evidence.  United States v. Wrice, 954 F.2d 406, 410 (6th Cir. 1992).

The Court will consider the entire course of police conduct, including the February 22, 2010 and March 2, 2010 interviews, when determining whether Investigator Ogle's actions rendered the Defendant's confession involuntary.[1]

---

[1]  The Defendant concedes that Miranda warnings were administered and waived at the outset of both interviews.  The Court recognizes that when Miranda warnings are waived at the beginning of an interrogation, it is "rare" to find that a confession was compelled "despite the fact that the law enforcement authorities adhered to the dictates of Miranda.'"  United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2010) (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)).

### 1. February 22, 2010 Interview[2]

### (i) Presence of Police Coercion

The Defendant argues that the following statements and circumstances were coercive and render his confession involuntary: (1) that he was subjected to hours of questioning[3] where he was told he would receive drug treatment and would be released, but if he chose not to confess, then he would receive a lengthy prison sentence; (2) the Defendant argues that he was told that he would not be charged with the firearm at issue in this case; (3) the Defendant argues that Investigator Ogle used deceptive tactics in presenting the case against the him. [Doc. 13 at 5].

First, the Government contends that Investigator Ogle's conduct was not objectively coercive because the interviews were conducted in a cordial manner, were not overly lengthy, and the Defendant had extensive experience with the criminal justice system. [Doc. 19 at 8]. Additionally, the Government asserts that the Defendant's will was not overborne by Investigator Ogle's conduct because the Defendant asked to speak with Investigator Ogle and is experienced with law enforcement. [Doc. 19 at 10].

---

[2]There is a dispute among the parties whether a confession was made by the Defendant during the February 22, 2010 interview. The Court finds that while the February 22, 2010 interview did not result in a full confession by the Defendant, inculpatory statements were made. The Court agrees with the Defendant that during the first interview, once the Defendant stated, "I have to go over there and get that gun," an inculpatory statement was made. [Ex. 1C, 14:31:47]. Investigator Ogle also testified at the hearing that at this point in the interview he knew there was a connection between the Defendant and the Kimber handgun. As such, this Court will analyze the statements made by the Defendant in the February 22, 2010 interview under the voluntariness standard.

[3]The Court will consider the length of the interview in its "totality of the circumstances" analysis.

This Court must first consider whether any statement or investigative tactic employed during the course of the interview amounted to police coercion. A court may not find a confession involuntary without first finding police coercion. Colorado v. Connelly, 479 U.S. 157, 165-67 (1986) (explaining that without coercive "state action," a subjective feeling of coercion by the defendant will not render a confession involuntary). "This is a high standard to overcome, which is not itself satisfied by showing that a police officer lied." United States v. Rutherford, 555 F.3d 190, 198 (6th Cir. 2009). Police promises of leniency may be objectively coercive "if they are broken or illusory." United States v. Johnson, 351 F.3d 254, 262 (6th Cir. 2003). An illusory promise "is a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action." Johnson, 351 F.3d at 262 n.1.

The Court will now consider whether specific statements and investigative tactics employed during the course of the first interview coerced the Defendant into making inculpatory statements regarding the Kimber handgun.

### (a) Statements Regarding Drug Rehabilitation and Release

First, the Court will consider whether the statements regarding whether Investigator Ogle's statements to the Defendant regarding drug treatment were objectively coercive. The Court of Appeals for the Sixth Circuit has found that while a promise of leniency is "relevant to determining whether a confession was involuntary . . . a statement about possible leniency upon cooperation is not generally impermissible." United States v. Wiley, 132 F. App'x 635, 640 (6th Cir. 2005) (internal citations and quotations omitted). "This is so, even when the promise to inform

the prosecutor is 'accompanied by a promise to request leniency or by speculation that cooperation will have a positive effect.'" Id. (quoting United States v. Guerro, 847 F.2d 1363, 1366 (9th Cir. 1988)). Other circuit courts have recognized that promises to discuss a defendant's cooperation with a prosecuting attorney does not result in an involuntary confession. See United States v. Broussard, 80 F.3d 1025, 1034 (5th Cir. 1996) (finding a confession voluntary even though officer promised to inform the U.S. Attorney of the defendant's cooperation); United States v. Ruggles, 70 F.3d 262, 265-66 (2d Cir. 1995) (holding a confession voluntary despite promise of leniency if defendant cooperated with law enforcement officials).

      In this case, Investigator Ogle's promise to inform the district attorney about the Defendant's cooperation did not result in an illusory or broken promise. See United States v. Montgomery, No. 09-2010, 2010 WL 2696602, *4 (E.D. Mich. May 6, 2010). Investigator Ogle conveyed to the Defendant that he would report the Defendant's cooperation to the district attorney, which could potentially result in the Defendant entering drug rehabilitation. Investigator Ogle repeatedly informed the Defendant that he was unable to make any promises, but that he would go to the district attorney and inform him of the Defendant's cooperation. Investigator Ogle told the Defendant it was the district attorney who could place him in drug rehabilitation, but he would still be charged. Likewise, his reference to "drug help" with his probation officer involved Investigator Ogle making recommendations since his arrest was for a probation violation. Moreover, the fact that the Defendant was not placed in drug rehabilitation is not the result of Investigator Ogle failing to contact the district attorney. Investigator Ogle testified that he spoke with the district attorney about the Defendant's cooperation. In addition, Investigator Ogle testified that at the time of the hearing, the Defendant's state case was bound over to the grand jury, indicating that the opportunity for the

Defendant to enter drug rehabilitation has not ended.

On the other hand, one of Investigator Ogle's statements concerning drug rehabilitation could constitute a promise of "leniency, coupled with threats of immediate imprisonment, hav[ing] the effect of coercing a suspect."[4] <u>Williams v. Withrow</u>, 944 F.2d 284, 287 (6th Cir. 1991). As seen on the video, the following discussion ensued:

Investigator Ogle: "I am willing to work with you."

Defendant: "How?"

Investigator Ogle: "Well, its all got to do with whether you get charged or whether you get sent to rehab, whether you go to prison or whether you go to rehab."

[Ex. 1C, 14:12:37-49].

The Court finds this statement, taken in isolation, could arguably be considered objectively coercive. This portion of the interview in isolation, seemingly indicates a promise of leniency of drug rehabilitation, coupled with the alternative of imprisonment, and is thus arguably coercive. <u>See</u> <u>Williams</u>, 944 F.2d at 289. In exchange for his confession, the Defendant was presented with two options by Investigator Ogle, one of leniency and one of imprisonment.[5]

_____

[4]The <u>Williams</u> case is most often cited as illustrating an illusory promise. This Court recognizes that the Supreme Court reversed the <u>Williams</u> court's finding of involuntariness on the ground that it was not presented in the habeas petition. As a result, the Court of Appeals has stated <u>Williams</u> finding of involuntariness is not controlling and declined to follow the decision. This Court will use <u>Williams</u> only as guidance and not as controlling on voluntariness determinations.

[5]The Court does not find this statement, in context, to be objectively coercive. The leniency of drug rehabilitation has always been spoken of as a potential alternative, depending on the district attorney's decision and the imprisonment is not immediate, but the likely result of the charges. Whether the effect of this statement even if deemed coercive, was sufficient to

However, less than one minute earlier, Investigator Ogle had told the Defendant he could not promise him anything except to go to the district attorney. [Ex. 1B at 14:11:54-14:12:02].

The Defendant also argues that Investigator Ogle made statements concerning his ultimate release. Throughout the interview, Investigator Ogle testified that he discussed the Defendant's potential release on re-established probation. It is coercive for law enforcement officials to tell a defendant that a confession will result in the defendant's release from jail and the police dropping all charges against the defendant. In Williams, the police told the defendant that he could either confess to his part in a murder investigation and "walk," or in the alternative, not confess and be charged with murder. 944 F.2d at 288. Ultimately, the police promised the defendant protection from all prosecution. Id. Further, the police persuaded the defendant to confess by asserting the focus of the investigation was to find the shooter. Id. at 287. While the court acknowledged that "effective interrogation techniques require . . . a carrot-and-stick approach to eliciting information," the court found that "when promises of leniency, coupled with threats of immediate imprisonment, have a coercive effect on a suspect, we are obliged to inquire whether the coercion in question was sufficient to overbear the will of the accused." Id. at 289. The court ultimately concluded that the defendant's statements were not given voluntarily and that "[h]is statements were conditioned on his belief that he would be released if he talked." Id.

This case is distinguishable from Williams. In the instant case, Investigator Ogle informed the Defendant on several occasions that if he was willing to "work with" Investigator Ogle, he would contact the Defendant's probation officer and inquire about re-establishing the Defendant's

overbear the Defendant's will must be examined in the totality of the circumstances surrounding the interview.

probation.  In <u>Williams</u>, the defendant was told his confession would result in immediate release and no charges being brought against him.  In this case, the Defendant was told that re-establishing his probation was dependant on his probation officer's approval.  While Investigator Ogle told the Defendant that he would like to get the Defendant back onto the street and testified that the Defendant could only help "bust up" gold exchanges from if he were released, these statements do not rise to the coercive level of <u>Williams</u>.  Investigator Ogle did not make a "deal" with the Defendant that if he confessed, he would not face any charges and leave jail that same day.  On several occasions, Investigator Ogle discussed his intent to charge the Defendant with burglary.  Therefore, the Court finds that Investigator Ogle's statements regarding drug rehabilitation and release do not rise to the level of objective coercion.

### (b)  Promises of Leniency Regarding the Stolen Gun

The Court must now determine whether Investigator Ogle's statements of leniency regarding the stolen gun amounted to coercive behavior.  The Defendant argues that Investigator Ogle promised that he would not charge the Defendant with the stolen gun during the first interview.  [Doc. 26 at 2].  The Government responds that the Defendant was only interested "with people who-then possessed the firearm and not with his own fate regarding the firearm related charge."  [Doc. 25 at 10].  In addition, the Government argues that "Investigator Ogle was [only] asserting that the defendant would not be charged in state court for a gun-related offense."  [Doc. 25 at 10].

Promises of leniency, such as not to charge a defendant, "may be coercive if they are broken or illusory."  <u>Johnson</u>, 351 F.3d at 262.  In <u>Johnson</u>, the police promised not to prosecute the defendant's half-sister if he turned himself in.  <u>Id.</u>  The court found that "this promise was not an

illusory promise as it actually committed the police to undertake a specific course of action." Id. Additionally, the court stated the "promise was not broken because the police in fact did not prosecute [the defendant's half-sister]." Id. The Court held that "the promise of leniency for [the defendant's half-sister] was not coercive under the Williams line of cases." Id.

In this case, Investigator Ogle stated three times during the first interview that "nobody's going to get charged with the gun one gun." [Ex. 1C at 14:29:11 - 14:30:06]. This Court finds these statements objectively coercive.[6] Investigator Ogle is promising leniency in the form of no charges being brought by him, as he is the one who "writes the warrants," in exchange for information on the location of the gun. After these representations, the Defendant made an inculpatory statement that he could get the gun back to Investigator Ogle in about "three hours." [Ex. 1C at 14:33:23].

The Court finds that despite the promise of leniency regarding the gun charge, Investigator Ogle could not bind federal authorities. See United States v. Streebing, 987 F.2d 368, 373 (6th Cir. 1993). In United States v. Handshoe, the defendant was charged in federal court with

---

[6] The Government contends that both Investigator Ogle and the Defendant were discussing whether the person currently in possession of the gun would be charged, not whether Investigator Ogle would charge the Defendant with the stolen gun. The Court finds this argument unpersuasive. Investigator Ogle is seen on the video, plainly stating, "*no one* is going to get charged with the gun" after previously stating, "I'm telling you right now . . . I'm the one who types the warrants. If I don't write the warrants, *you* don't get charged with the gun." [Ex. 1C at 14:28:44 - 14:29:45 (emphasis added)]. Investigator Ogle further stated that, "I don't give a shit about putting you in jail." [Ex. 1C at 14:30:06]. Investigator Ogle testified that he believed a family member was in possession of the gun, and his statements were made to demonstrate that the person currently in possession of the gun would not be charged. Despite Investigator Ogle's testimony, the video indicates that if this were in fact his intent, it was not clearly conveyed by his statements to the Defendant during the interview. An objectively reasonable person in the Defendant's shoes could believe these words were either directed toward him or at least included him.

knowingly possessing a stolen firearm, after Kentucky state authorities represented to the defendant that he would not be prosecuted. No. 08-32-ART, 2009 WL 223854, *1 (E.D. Ky. Jan. 29, 2009). In <u>Handshoe</u>, the defendant bought guns from two people who were currently arrested for burglaries. <u>Id.</u> After Kentucky authorities received this information, a search warrant was executed for the defendant's residence where the stolen firearms were recovered. <u>Id.</u> The defendant was told by state authorities that if "he aided in the prosecution of Griffith and Gamble, he would not be charged for the items seized during the execution of the search warrant." The defendant cooperated with state authorities and "was willing to testify for the Commonwealth in their prosecution." <u>Id.</u> Subsequently, a federal grand jury indicted the defendant "on charges of knowingly possessing a firearm . . . as well as charges relating to the operation of an unlicensed still." <u>Id.</u> The court found that "a promise of immunity from prosecution in one district is contractual in nature and does no bind other parties not privy to the original agreement." <u>Id.</u> at *2 (internal citations and quotations omitted). Moreover, the court noted that "[t]here is no evidence that the state authorities had either actual or apparent authority, as agents of the federal government, such that the United States would be bound to an agreement between the Defendant and state authorities." <u>Id.</u> In addition, <u>Handshoe</u> holds that promises made by state authorities not to prosecute did not indicate to the defendant that "the United States would be bound to an agreement between the Defendant and state authorities." <u>Id.</u>

While <u>Handshoe</u> involves an oral promise of immunity by state police, the principal that state authorities cannot bind federal agents applies in this case. Investigator Ogle, a state official, told the Defendant he would not charge the Defendant regarding the stolen Kimber gun. Investigator Ogle could not bind the federal government to this statement. In addition, the Defendant was also

aware that Investigator Ogle was going to charge him with the burglaries, but not the stolen gun. Investigator Ogle testified that at the time of the interview, he did not plan to go to the federal government with information regarding the gun. This promise was neither broken nor illusory because the Defendant was not charged with the stolen gun in state court. The Defendant could not believe, based on a KPD officer's statement, that "the United States would be bound to an agreement between the Defendant and state authorities." Id.

Even if Investigator Ogle were able to bind federal authorities to his promise, the Court will consider below whether the effect of this statement was sufficient to overbear the Defendant's will based on the totality of the circumstances.

### (c)    Misrepresentations and Deceptive Tactics

First, the Court will consider whether Investigator Ogle's misrepresentations regarding the Defendant's DNA and the victim's identification of the Defendant were coercive. Courts have consistently upheld confessions as voluntary, despite the police deceptions and misrepresentations. See Frazier v. Cupp, 394 U.S. 731, 737-39 (1969); Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994); United States v. Little, No. 92-2340, 1993 WL 453396, *8 (6th Cir. Nov. 4, 1993).

"An involuntary confession may result from psychological, no less than physical coercion by law enforcement officials. However, not all psychological tactics are unconstitutional." Ledbetter, 35 F.3d at 1067 (internal citations omitted). The Supreme Court has held that police deception does not always render a confession involuntary. See Illinois v. Perkins, 496 U.S. 292, 297 (1990) (holding that "Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in a person he supposes to be a fellow prisoner"); Frazier, 394 U.S. at 739

(1969) (finding the defendant's confession involuntary despite a false statement by law enforcement that codefendant had confessed and implicated the defendant).  The court must examine the "totality of the circumstances" of each case when determining whether any given police tactic is unconstitutional.  Ledbetter, 35 F.3d at 1067.

The Sixth Circuit Court of Appeals has found that "even demonstrating that an affirmative misrepresentation was made in the course of taking a statement is insufficient to establish a violation of the Due Process Clause, requiring the suppression of evidence."[7] Rutherford, 555 F.3d at 198.  Moreover, coercive police activity is a "high standard to overcome, which is not itself satisfied by showing that a police officer lied." Id.  "The misrepresentation at issue must in fact overbear the will of the accused." Id.  For example, in Ledbetter, the Sixth Circuit Court of Appeals found the defendant's confession was voluntary, despite the use of "various psychological tactics and misrepresentations." 35 F.3d at 1066.  Police first alleged they obtained the defendant's fingerprint from the crime scene. Id.  Next, the police falsely stated to the defendant that the "female victim and two other witnesses had identified him from a photographic array." Id.  In addition, the police led the defendant to believe the victim was outside the interview room, when instead standing female dispatcher "in front of a two-way mirror" creating the appearance of a "woman's sillouette . . . at the window." Id.  The defendant began crying and confessed to the crime. Id.  The court was

---

[7]Other Circuits have found that officer deception is permissible in obtaining a confession. See United States v. Rodgers, 186 F. Supp. 2d 971, 977 (E.D. Wis. 2002); see also United States v. Haswood, 350 F.3d 1024, 1029 (9th Cir. 2003) (finding that "even misrepresentations by law enforcement . . . do no necessarily evidence coercive conduct"); Lucero v. Kerby, 133 F.3d 1299, 1311 (10th Cir. 1998) (determining that although the police officer "admitted to making false statements about fingerprint evidence found in [the victim's] home, such misrepresentations, without more, do not render an otherwise voluntary confession involuntary.").

unpersuaded that the police deception was enough to render the defendant's confession involuntary "simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." Id. at 1070.

Additionally, in Little, the Sixth Circuit Court of Appeals found that the defendant's confession was voluntarily made after police "deliberately misled defendant concerning the evidence they had against him." 1993 WL 453396 at *7. The defendant was told by police that his fingerprint was found on the murder weapon. Id. Further, the police "purposefully led defendant to believe that one of defendant's cohorts had provided agents with that information." Id. The court held that "the defendant has not proved that the agents' conduct so overwhelmed his will as to render his confession involuntary." Id. at *9.

In contrast, the Supreme Court in Spano v. New York, the Court held a confession involuntary when certain psychological tactics were used by the police. 360 U.S. 315, 319 (1959). In Spano, the defendant called a police officer friend and admitted killing the victim. Id. at 317. Subsequently, the defendant surrendered to the police. Id. Several officers questioned the defendant throughout the course of the evening with no success. Id. at 319. The officers devised a plan in which the defendant's police officer friend would tell the defendant falsely that his job was at risk due to the defendant's phone call. Id. The police officer ultimately obtained the defendant's confession after speaking with him four times. Id. The Court considered the "totality of the circumstances" by focusing on the defendant's inexperience with the police and emotional instability, the fact that he was questioned through the night by many officers, and the inducements by his childhood police officer friend to confess. Id. at 323. The Supreme Court held that the defendant's "will was overborne by official pressure, fatigue and sympathy falsely aroused[.]" Id.

The circumstances surrounding the instant case are more similar to <u>Ledbetter</u> and <u>Little</u> than <u>Spano</u>. Investigator Ogle misrepresented the strength of the case against the Defendant by informing him that the police found his DNA on the stolen ring and the victim identified the Defendant, linking him to the burglary. While the statements made by Investigator Ogle were false, the nature of the false statements is analogous to the statements <u>Ledbetter</u> and <u>Little</u>. In the present case, Investigator Ogle did not attempt to obtain the Defendant's confession by causing him to fear the adverse consequences of a friend, such as the police officer in <u>Spano</u>, or a family member. While the deception in the instance case did not rise to level of <u>Spano</u>, all the cases indicate that this Court must consider whether such deceptive police tactics were sufficient to overbear the Defendant's will.

### (ii) Effect of Police Coercion

The Court will consider whether Investigator Ogle's statements regarding the effect of a confession on his opportunity to enter drug rehabilitation, the statement that no one would be charged with the gun, and the deception surrounding the amount of evidence against the Defendant rose to a level sufficient to overbear the Defendant's will. Police coercion alone does not render a defendant's confession involuntary. The Court must also examine whether the coercive police conduct was sufficient to overbear the defendant's will, and whether the coercion was in fact the cause of the defendant's will being overborne. <u>McCall v. Dutton</u>, 863 F.2d 454, 459 (6th Cir. 1988). In determining "whether the will of the accused has been overwhelmed by official pressure[,]" courts will consider

> the psychological impact on the accused by the totality of the circumstances of the confession, including the age of the accused, his level of education and intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of

> violent reprisal, actual physical punishment, the proximity of the coerciveness of the confession as given, and the inherent coerciveness of the confession as given.

Wrice, 954 F.2d 406, 411 (6th Cir. 1992).

The Government argues that even if some police coercion occurred, the totality of the circumstances show that the Defendant's will was not overborne by the coercive statements of Investigator Ogle. The Defendant argues that the length of the interrogation coupled with repeated coercive statement by Investigator Ogle was sufficient to overbear his will.

In examining the totality of the circumstances, the Court finds that although the above coercive, and/or arguably coercive statements were made, these statements did not overbear the will of the Defendant. Although the Defendant argues that the length of the first interview, approximately two hours, was sufficient to overbear the his will, the Sixth Circuit has upheld confessions as voluntary when a defendant is detained over a greater amount of time. See United States v. Redditt, 87 F. App'x 440, 444 (6th Cir. 2003) (holding confession voluntary after the defendant was detained in the interview room for nine hours). Moreover, as seen on the video, it is clear that the Defendant indicated he understood the contingent nature of Investigator Ogle's promises.[8] Based on his prior criminal record, the Defendant has encountered police on several occasions in the past. See Little, 1993 WL 453396, at *9 (6th Cir. 1993) (finding significant that the defendant "was already serving a sentence in an unrelated matter, was not a novice" with law enforcement). The video further indicates, and it is established, that the Defendant received, and affirmatively acknowledged he understood his Miranda rights prior to the interview. The Defendant was allowed to use the restroom

---

[8]The Defendant told Investigator Olge several times to stop "jibber-jabbering" when discussing drug rehabilitation, and further stated that if Investigator Ogle was unable to make any decisions, then "we need to get a DA here." [Ex. 1C at 14:12:48].

and given water.  There is no evidence that the Defendant feared violence toward himself at any point during the interview.

### (a)    Statements Regarding Drug Rehabilitation

Significantly, after Investigator Ogle stated that the Defendant's cooperation would result  in whether the Defendant enters drug rehabilitation or prison, the Defendant tells Investigator Ogle to stop "jibber-jabbering" and if he is unable to make these decisions then "you need to get a DA in here."  See United States v. Smith, No. 93-5953, 1994 WL 162584, *6 (6th Cir. Apr. 28, 1994) (finding that defendant's will was not overborne when he stated he did not believe that agents could help his case and insisted on speaking with the U.S. Attorney directly).  This portion of the interview highlights the fact that Investigator Ogle repeatedly informed the Defendant, and he  acknowledged he understood, that Investigator Ogle was unable to make any promises about drug rehabilitation or release, but that he could make recommendations to the district attorney and the probation officer. While the Defendant argues that Investigator Ogle informed him that he "would serve a lengthy prison sentence," Investigator Ogle was permitted to enlighten the Defendant of the his situation.  See United States v. Daniel, No. CRIM.A. 4:04-CR-017, 2006 WL 753082, *3 (W.D. Ky. Mar. 22, 2006) (holding that "[a]gents merely enlightened the Defendant as to the gravity of his situation and informed him of the likely result of his cooperation.  The Defendant voluntarily chose how to proceed at that point.").

Further, Investigator Ogle told the Defendant that he must be charged first before involving the district attorney, indicating that the Defendant would not be released.  After the Defendant re-initiated the interview with Investigator Ogle in the first interview, he did not indicate any interest in the drug rehabilitation, but was concerned with what could be done for him

immediately, therefore, there was no evidence that the Defendant believed that if he did not speak immediately, he would lose his chance at drug rehabilitation. See United States v. Starks, No. 95-4105, 1997 WL 271744, *4 (6th Cir. May 21, 1997) (concluding that there was "no evidence that the officers made [the defendant] believe that he had to talk immediately, or lose his chance to avoid federal prosecution").

### (b)    Statements Regarding the Gun

The Defendant cites to the case of United States v. Lall, to support the proposition that state officials' assurances of non-prosecution may render a confession involuntary. 607 F.3d 1277, 1287 (11th Cir. 2010). In Lall, the defendant made inculpatory statements about credit card fraud to state police while in the bedroom of his home, after assurances that no charges would be brought against him. Id. The defendant was subsequently questioned at the police station where officers again were told that the police were not going to pursue any charges. Id. at 1281, 1289. The Defendant was ultimately charged by the Secret Service. Id. at 1282. The Eleventh Circuit looked to the circumstances surrounding the first interview, particularly that the defendant was only twenty-one years old, the defendant's bedroom door was shut during the interview, three officers were present in the bedroom, and family members were not allowed inside. Id. at 1281, 1284. The Court also found that the officers promised that the defendant's statements would not be used against him, contradicting the administered Miranda warnings.

The circumstances of this case are distinguishable from Lall. In this case, Investigator Ogle made the statement that "no one" would be "charged with the gun." See Starks, 1197 WL 271744, at *4 (concluding that defendant "may have hoped that volunteering incriminating statements would somehow help him avoid federal prosecution; that does not mean that the threat of federal

prosecution coerced him into talking"). The Defendant in this case, however, was in his mid-forties at the time of the first interview. The first interview was conducted at the police station. As seen on the video, Investigator Ogle advised the Defendant that he suspected his involvement in several burglaries and, regardless of what he told Investigator Ogle regarding the stolen gun, the Defendant would face burglary charges.

Moreover, the Defendant's reluctance to divulge the incriminating information indicates he "fully understood the consequences of these statements." United States v. Harper, 923 F. Supp. 987, 993 (E.D. Mich. 1996). The Defendant repeatedly asserted his disbelief that Investigator Ogle obtained his DNA from the stolen rings and that the victim saw him flee from the Hillcrest home. While the Defendant re-initiated the interview by knocking on the interview room door after the deceptive statements were made, the Defendant again indicated his disbelief that such evidence existed by telling Investigator Ogle he would "still" like to see the DNA evidence and the eye-witness identification. Despite the fact that he was skeptical about the evidence, the Defendant indicated a willingness to continue speaking with Investigator Ogle. See United States v. Williams, 612 F.3d 417, 421-422 (6th Cir. 2010) (finding that the defendant's will was not overborne when he re-initiated contact with police, disclaimed having an attorney, and was Mirandized each time). Once Investigator Ogle re-entered the room, the Defendant is seen on the video standing up, raising his voice, and telling Investigator Ogle to stop "jibber-jabbering." Investigator Ogle testified this type of behavior is rare during an interview. Moreover, the Defendant's questions to Investigator Ogle concerned what would result from the "stack of papers" containing twenty to thirty burglary investigations, rather than the Pendley burglary. Additionally, the Defendant did not indicate that he wished to speak to an attorney. See Ledbetter, 35 F.3d at 1069 (finding a confession voluntary

despite the presence of an attorney when the Defendant was read his Miranda rights, "yet [the defendant] did not formally request an attorney").

This Court cannot conclude, in view of the totality of the circumstances, that the promise of leniency made to the Defendant would suffice to overbear the Defendant's will in making inculpatory statements during the first interview. The Court finds that the inculpatory statements made by the Defendant during the February 22, 2010 were voluntarily made by the Defendant.

## 2. March 2, 2010 Interview

### (i) Presence of Police Coercion

The Defendant argues that his confession on March 2, 2010 was involuntarily made as a result of the coercive tactics of Investigator Ogle. [Doc. 13 at 5]. Specifically, the Defendant argues that Investigator Ogle failed to inform him of the false statements made during the first interview and that "he had been left in jail to consider the promises and misrepresentations made by the investigator." [Doc. 24 at 15]. In addition, the Defendant argues that further promises of leniency were made, "along with statements related to what God would want [the Defendant] to do." [Doc. 24 at 15-16]. The Defendant contends that specific promises of leniency, along with other misrepresentations "pushed [the Defendant] from a position of denying involvement in the burglary to one of making a confession." [Doc. 24 at 16].

The Government responds that the Defendant's confession was made knowingly, intelligently, and voluntarily. [Doc. 25 at 16]. Specifically, the Government contends that Investigator Ogle's tactics were not coercive, because the "Sixth Circuit has held that similar conduct used in other cases was permissible." [Doc. 25 at 16].

The Court has found above that the inculpatory statements made by the Defendant

during the first interview were voluntarily made, therefore, the Court will analyze independently whether the statements or circumstances surrounding the March 2, 2010 interview rendered the Defendant's confession involuntary.

### (a) Misrepresentations

The Defendant argues that Investigator Ogle failed to inform him of the false statements made during the first interview and that "he had been left in jail to consider the promises and misrepresentations made by the investigator." [Doc. 24 at 15].

This Court discussed above the effect of misrepresentations during an interview when describing that Courts have consistently upheld confessions as voluntary, despite the police deceptions and misrepresentations. See Cupp, 394 U.S. at 737-39; Ledbetter 35 F.3d at 1070; Little, 1993 WL 453396, at *8 (6th Cir. 1993). But see Spano, 360 U.S. 315, 319 (1959).

At the beginning of the second interview, Investigator Ogle provided the Defendant with information similar to the first interview regarding the Hillcrest burglary. Specifically, Investigator Ogle began the second interview by reiterating Gary Johnson's statement identifying the Defendant as the person from whom he bought the stolen rings. Additionally, Investigator Ogle stated he wished to discuss the same burglary where the victim identified the Defendant after seeing him flee the home on Hillcrest. The circumstances surrounding the instant case are more similar to Ledbetter and Little than Spano. The Court finds that while the misrepresentations from the first interview were not cleared up during the second interview, and Investigator Ogle repeated the misrepresentation at the beginning of the second interview, there are no facts in the present case that the Defendant's confession was the result of his fear of the adverse consequences to a friend, such

as the police officer in <u>Spano</u>, or a family member.

        In addition, the Defendant and his wife initiated contact with Investigator Ogle after waiting eight days.  This period of time indicates that the Defendant thoughtfully considered his options before he contacted Investigator Ogle.  At one point during the interview, the Defendant alluded to the fact that he considered the option of not confessing and letting Investigator Ogle find the gun on his own.  This action indicates that the Defendant weighed his options before confessing.  By contacting Investigator Ogle numerous times, the Defendant signaled that he was willing  to voluntarily speak with Investigator Ogle regarding the stolen handgun.  Accordingly, the misrepresentations did not overbear the Defendant's will.

### (b)  Further Promises of Leniency and Appeals to the Defendant's Conscience

        The Defendant argues that further promises of leniency were made, "along with statements related to what God would want [the Defendant] to do."  [Doc. 24 at 15-16].

        This Court discussed above that the Court of Appeals for the Sixth Circuit has found that while a promise of leniency is "relevant to determining whether a confession was involuntary . . . a statement about possible leniency upon cooperation is not generally impermissible."  <u>Wiley</u>, 132 F. App'x at 640.  The Government cites a Third Circuit Court of Appeals case, <u>Miller v. Fenton</u>, that this Court finds persuasive.  796 F.2d 598 (3rd Cir. 1986).  In <u>Fenton</u>, the defendant argued that his confession was the result of psychological coercion.  <u>Id.</u> at 603.  During the interview, the detective's "major theme . . .  was that whoever had committed such a heinous crime had mental problems and was desperately in need of psychological treatment."  <u>Id.</u> at 602.  Additionally, the detective made some promises to the defendant regarding him receiving psychiatric help, such as "'[W]e're going to see to it that you get the proper help.  This is our job.'"  <u>Id.</u> at 610.  The court

found that while "such a promise could be quite compelling in itself . . . [a] distinction can be drawn, however, between promises of leniency in the imminent criminal proceeding against the defendant and promises of help with some collateral problem." Id. The court held that, "[T]he only outright promise [the detective] made was to get [the defendant] help with his psychological problem . . . indirect promises do not have the potency of direct promises." Id.

The promises made to the Defendant regarding drug rehabilitation are analogous to the promises in Fenton. In this case, Investigator Ogle was aware that the Defendant wished to speak about the Kimber gun, because Investigator Ogle testified that he was contacted by the Defendant and his wife several times. At the beginning of the second interview, the Defendant himself, voluntarily asserted that he "failed" after leaving prison by "using drugs and alcohol." Therefore, the theme of the second interview was to get the Defendant "clean." As the interview progressed, the Defendant told Investigator Ogle that he was going to point him in the right direction of the gun. After the inculpatory statement, Investigator Ogle stated that he "believe[d] . . . I know [the district attorney] will work with us this time," implying that the district attorney would help place the Defendant in drug rehabilitation once in jail. This promise is analogous to the promise in Fenton that the police were "'going to see to it that [the defendant] get[s] the proper help.'" Id. at 610. The Defendant was aware from the repeated statements by Investigator Ogle, that he could not do anything without the district attorney's approval, and at most, Investigator Ogle was informing the Defendant that his cooperation could result in help with a "collateral problem." Id. Investigator Ogle's assertion that "I know [the district attorney] will work with us this time," is a promise that the district attorney and Investigator Ogle would engage in negotiation regarding the Defendant's prospects of entering "in-house" drug rehabilitation. Accordingly, the investigator's indirect promises of help with the

Defendant's substance abuse problems were not coercive.[9]

In addition, the Defendant argues that he was improperly promised "divine salvation" if he confessed. [Doc. 13 at 2; Doc. 24 at 15-16]. The Government responds that appealing to a defendant's conscience is not an improper police tactic. [Doc. 27 at 13].

The Court finds the discussion about God was initiated by the Defendant after he confessed to the location of the stolen gun.[10] After the Defendant confessed to the location of the stolen gun, Investigator Ogle stated, "Now that you've got that off your chest . . . I want to get you clean." [Ex. 2A at 13:07:01]. After the confession, it was the Defendant who initiated a conversation with Investigator Ogle about God and repenting for his sins, specifically stating that he was sorry for the things he has done. [Ex. 2A at 13:08:00]. Investigator Ogle simply responded that the Defendant does not need him to repent for his sins, and simply added his opinion that the Defendant had done what God would want him to do. This conversation occurs after the confession and could not have coerced the Defendant into confessing the location of the stolen Kimber gun. see also United States v. Craft, 495 F.3d 259, 264 (6th Cir. 2007) (concluding that a promise of leniency made after the incriminating statement was given could not have coerced the statement). Moreover, appealing to a defendant's conscience is not an improper police tactic. See Berghuis v. Thompkins, 130 S. Ct. 2250, 2263 (2010 (finding that the "fact [the officer's] question referred to [the defendant's] religious

---

[9]If Investigator Ogle did make a promise of leniency regarding drug rehabilitation, the Court will consider below whether the effect of this statement was sufficient to overbear the Defendant's will based on the totality of the circumstances.

[10]While the Court notes that the Defendant told Investigator Ogle that his nephew paid three hundred dollars for the Kimber gun after this discussion, he had already confessed to the location of the gun and the burglary. Moreover, the Defendant initiated the conversation immediately after confessing to the burglary.

beliefs also did not render [the defendant's] statement involuntary").

### (ii)  Effect of Police Coercion

In determining whether any of the police tactics described above render the Defendant's confession involuntary, the question then becomes whether the tactics overbore the Defendant's will.  The Defendant contends that specific promises of leniency, along with other misrepresentations "pushed [the Defendant] from a position of denying involvement in the burglary to one of making a confession."  [Doc. 24 at 16].  The Government responds that even if the police conduct was coercive, it did not rise to a level sufficient to overbear the Defendant's will.  [Doc. 25 at 12].

The second interview was conducted at the police station at the Defendant's initiation, and the tone of the interview was cordial.  The Defendant was offered water in the second interview.  There was no threat of physical violence and the Defendant does not argue that he was fearful.  See Berghuis, 130 S. Ct. at 2263 (finding a confession involuntary when the defendant "does not claim that police threatened or injured him during the interrogation or that he was in any way fearful").  The Defendant and his wife contacted Investigator Ogle about the possibility of the Defendant speaking with him again, a voluntary action indicating he wished to discuss the Kimber gun.  The Defendant is a man in his forties, has had previous experience with law enforcement, initiated the contact and desire to talk, and was given the Miranda warning.  See United States v. Sanchez-Diaz, No. 1:09-CR-56, 2009 WL 3429754, *7 (E.D. Tenn. Sept. 10, 2009) (finding that police tactics did not overbear the defendant's will, although he was a "young man, he has had prior experience with the judicial system and was given the Miranda warning").  In addition, the interview was not overly lengthy.

Moreover, the Defendant acknowledged that he was ready to speak with Investigator Ogle about the Kimber handgun because he did not want to lead a life of crime anymore, and that he had "[come] to his senses."

While Investigator Ogle made the remark "I know [the district attorney] will work with us this time," this assertion does not effect the voluntariness of the Defendant's confession based on the above circumstances of the interview and personal characteristics of the Defendant. See Fenton, 796 F.2d at 612 (finding confession voluntary, despite the use of a "form of psychological trickery, [because the court] do[es] not believe that these elements of the interrogation affected the voluntariness of the confession" based on the defendant's "personal characteristics"). The video indicates that the Defendant was not influenced by the misrepresentation of eye-witness identification, rather he was concerned with the statement made by Gary Johnson. After the misrepresentation by Investigator Ogle, the Defendant indicated his frustration with Gary Johnson, stating that "as far as the rings go, I don't understand . . . [Gary Johnson] knowed they hot. [The Defendant] don't know why [Gary Johnson] took them to the pawn shop anyway." In addition, the Defendant expressed concern that Gary Johnson was trying to "put it all on [him]." The Defendant further informed Investigator Ogle that he did not wish to lead a life like Gary Johnson and that he discussed with his wife that he did not want "people to talk about [him] . . . like burglary is all [he does]," rather than go to work. After the Defendant's initial statements regarding Gary Johnson, he stated, "I'm going to put y'all in the direction of where that gun is at." The Defendant did not reference the DNA evidence discussed in the first interview or the eye-witness identification. None of the Defendant's statements indicate he was sitting in jail for eight days thinking about the misrepresentations of Investigator Ogle. At this point in the interview, Investigator Ogle was aware

that the Defendant knew that the Defendant was willing to talk about the stolen gun.

Additionally, the Defendant was aware that the possibility of drug rehabilitation was contingent on the district attorney. At no point did the Defendant indicate nor were any representations made that he thought he would be released from jail.

Moreover, the Defendant maintained a guarded and suspicious attitude during the second interview. At the beginning of the interview, after being read his Miranda rights, the Defendant asked if anything he said would "incriminate" him. Investigator Ogle responded that he doesn't know, but the only way to get him "court-ordered help" was through the district attorney. After acknowledging that he would point Investigator Ogle in the direction of the gun, Investigator Ogle stated "[i]t's ok. This is the beginning of getting you some help," to which the Defendant responded "I know, but I don't want say anything to incriminate myself." These statements indicate that the Defendant was still hesitant to speak with Investigator Ogle about the burglaries. Further, the Defendant sought assurances from Investigator Ogle that no one, particularly his nephew, would know that he was speaking with Investigator Ogle, before stating that his nephew was in possession of the gun. This action by the Defendant suggests that he was aware of the potential impact of his statement, and would go no further until he received such assurances from Investigator Ogle. Thereafter, the Defendant signed the Miranda waiver, and voluntarily confessed.

This Court cannot conclude, in view of the totality of the circumstances, that the promise of leniency made to the Defendant sufficed to overbear the Defendant's will in making inculpatory statements during the second interview. The Court likewise finds that the inculpatory statements made by the Defendant during the March 2, 2010 interview were voluntarily made by the Defendant. As a result, the Defendant's statements regarding the location of the Kimber gun should

not be suppressed and the handgun should not be excluded a "fruits of the poisonous tree" pursuant to <u>Wong Sung v. United States</u>, 371 U.S. 471 (1963).


## IV.  CONCLUSION

After thoroughly considering the parties briefs and arguments, the testimony at the evidentiary hearings, and the relevant caselaw, the Court **RECOMMENDS** that the Defendant's Motion to Suppress Statements [Doc. 13] be **DENIED**.[11]

Respectfully submitted,


    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[11]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); <u>see</u>  <u>United States v. Branch</u>, 537 F.3d 582 (6th. Cir. 2008); <u>see also</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order).  The District Court need not provide <u>de</u> <u>novo</u> review where objections to this report and recommendation are frivolous, conclusive, or general.  <u>Mira v. Marshall</u>, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  <u>Smith v. Detroit Federation of Teachers</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).